UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| RASHEEM MATTHEWS, | ) | CASE NO.:  1:01CV02049 |
| | ) | |
| Petitioner, | ) | JUDGE JOHN ADAMS |
| | ) | |
| v. | ) | |
| | ) | |
| TODD ISHEE, Warden, | ) | **ORDER AND DECISION** |
| | ) | [Resolving Document #40] |
| Respondent. | ) | |

The Court referred the above action to Magistrate Judge Jack B. Streepy for a Report and Recommendation on Petitioner Rasheem Matthews's Petition for Habeas Corpus.  The Magistrate recommended that the Court dismiss the Petition based on his finding that Matthews's due process rights were not violated by prosecutorial misconduct.  Matthews filed Objections to the Recommendation.  Respondent Todd Ishee, Warden, has not responded to those Objections.  Subsequently, Matthews filed two Notices of Additional Authority in support of his Objections and Petition.  Upon review of the filings in this action, Recommendation and applicable law, the Court chooses to not adopt the Magistrate's Recommendation and performs an independent review of the Petition.

**I. Background Facts / Procedural History**

In April of 1990, Matthews was indicted by the Cuyahoga County Grand Jury for unlawfully and purposely causing the death of Wayne Price and for a firearm specification while committing the offense charged.  The murder occurred in the early morning hours of October 16, 1989, when Price was shot and killed at the King-Kennedy

Housing Projects.  Price, his common law wife, Renee Germany, and a friend, Kenneth Lee, drove to the area to purchase cocaine.  When they arrived, Price parked the car near an alcove that lead to the courtyard of the complex.  He and Lee got out of the vehicle and proceeded toward the alcove while Germany remained in the car.  Price stopped to speak to a friend who approached.   Theodore Roulette testified that he was the one who Price had spoken to.  Price, Roulette and Lee all eventually arrived in the courtyard, although they did not remain together.  There was approximately ten to fifteen people in the courtyard at that time either engaged in drug activity or loitering.  It is at this point that the trial testimony of Lee and Roulette differ.

Lee testified that the courtyard was dark and he didn't recognize any of the people present.  However, Roulette stated that it was illuminated on one side and shadowed on the other.  Someone began to throw eggs from a balcony above.  Roulette claims that one of the eggs struck Price.  Lee did not observe this but stated that he recalled Price say, "I am a forty something year old man.  I don't play these games."  Roulette testified that Matthews and Price had words but that he did not see Price do anything aggressive or violent.  Lee stated that when he saw the argument between Price and another man he did not recognize, he started walking back out of the courtyard.  As Lee was exiting the alcove, he heard shots fired behind him and took off running.  Lee did not learn of Price's death until a few days later.

Roulette testified that he saw Price facing Matthews, heard gunshots fired and observed Price holding the lower part of his body as he spun around.  Roulette also testified that he observed Matthews with a gun in his hand.  Roulette claimed that

Matthews had shot Price.  After the shooting, Roulette ran through the alcove and left the area.  He also did not learn of Price's death until a few days later.

The county coroner testified that Price had bled to death from two gunshot wounds.  One entered the right mid-lower back area, the other entered the right hip.  Both bullets exited the lower right abdomen.

Germany testified that she remained in the car while the above events occurred. She stated that when she heard the gunshots, she ducked down inside the car and remained there until she heard her husband's voice.  When Germany looked up, she saw Price laying in the tunnel with a man standing over him.  She claimed that she heard her husband say, "man, I'm already hit, you don't have to do that."  Germany was not able to identify the man her husband was speaking to.  After this man left and headed back toward the courtyard, Germany went to Price, and with the help of an unidentified man, got him into the car.  Germany stated that Price told her somebody had shot him over something silly and to get him to the hospital.  Germany then drove Price to the hospital.

In March of 1990, Roulette was incarcerated in the Cleveland City Jail for theft. Roulette claims that while there, he encountered Price's brother.  After this encounter, Roulette went to the Cleveland Police Department and gave a statement that he had witnessed the encounter and named Matthews as the shooter.

During Matthews's trial, the prosecution also presented the testimony of a Charles Paxton, a jailhouse informant.  Paxton testified that he was introduced to Matthews by corrections officers while in jail.  Paxton stated that Matthews had confessed to him that he shot Price two times because Price had been bad mouthing him.  Paxton claimed that Matthews told him that Price was not the first man he had killed in Cleveland.  Paxton

also stated that Matthews told him that he had given drugs to Price on credit and he had

not paid for them.  Additionally, Paxton testified that Matthews told him that a woman by

the name of Juanita had witnessed the shooting and he would ensure that she wouldn't

testify at the trial.  Claiming that he received no consideration for his testimony by the

State in his own criminal case, Paxton testified  that he had been told by another inmate

not to testify, had been offered money not to testify, and had been threatened by both

Matthews and some corrections officers once it was learned inside the jail that he was

going to be a witness at the trial.  Paxton claimed that he came forward because he did

not think it was right to kill someone and brag about it.

Matthews presented the testimony of Evelyn Roulette to discredit her husband's

statements.  She testified that Roulette had not been in her apartment that evening as he

claimed, was a liar, and couldn't see without his glasses.  Matthews also presented the

testimony of Francis Barrett, the man Paxton claimed told him not to testify.  Barrett

stated that his cell was next to Paxton's and he never saw or heard Paxton being

threatened by Matthews or any correction officers at the jail.  Matthews also offered the

testimony of a Quanita Muwwakkil, who originally had also been charged with Price's

murder.  Muwwakkil stated that she did not know Price or Matthews nor did she witness

any shooting on the evening in question.

Matthews was originally tried on the murder charge but a mistrial resulted on

June 22, 1990, when the jury was unable to reach a verdict.  A second trial was held and

on August 3, 1990.  The jury convicted Matthews on the murder charge.  Three days

later, the trial court sentenced Matthews to a term of fifteen (15) years to life in a state

correctional institution for the charge of murder and three (3) years for the firearm
specification which was to be served consecutively.

Before Matthews's trial, Roulette had been indicted on seven felony charges,
unrelated to the above action, in three different criminal cases including: (1) March 12,
1990 - forgery, uttering, grand theft of a motor vehicle and receiving stolen property; (2)
May 29, 1990 - theft with a violence specification; and (3) July 24, 1990 - theft with a
violence specification and breaking and entering.  See Respondent's Answer/Return of
Writ, exhibit 28, p. 7.  On August 16, 1990, ten days after Matthews was sentenced for
murder, with the approval of Prosecutor Marino, Roulette pled to lesser included offenses
on amended indictments in all three cases.  In the March 1990 case Roulette pled guilty
to attempted forgery, a first degree misdemeanor and counts 2, 3 and 4 were nolled.  In
the May 1990 case, Roulette pled to attempted theft, a first degree misdemeanor, and the
violence specification was deleted.  In the July 1990 case, Roulette pled to the lesser
included offense of theft with the violence specification deleted, also a first degree
misdemeanor, and count 2 was nolled.  During the plea proceedings, Roulette's attorney
stated:

> The court is well familiar with the facts leading up to this plea
> bargaining today.  Your honor, I would just point out that through
> extensive discussions with Mr. Marino in the major trial division and the
> Cuyahoga County Prosecutor's Office and Detective Qualey of the
> Cleveland Police Homicide Unit, it's my understanding that without the
> testimony of my client, the convicted murderer known as LAJ would not
> be behind bars today.  It's my client's testimony thatput him behind bars.
> Nothing can excuse Mr. Roulette's prior criminal history or criminal
> behavior, but one thing remains a fact is that he has risked his own life, the
> life of his wife, who is in the courtroom today, and the safety of his family so
> that this murderer was brought to trial and convicted and is currently
> serving his time.  We would ask the Court's consideration and also ask for
> an immediate sentencing taking into consideration of the foregoing factors..

See Respondent's Answer/Return of Writ, exhibit 1, p. 8.  Roulette was given a

suspended sentence of six months incarceration and placed on five years probation.  The

sentencing court had the following exchange with Roulette:

> THE COURT: Let me make one thing real clear.  While you benefited
> from the plea bargain presently before this Court is well known to you, it
> is well known to the prosecutor's office and it is well known to the defense
> counsel and it's well known to this Court, but you come back here with a
> dirty urine, you come back here not having paid this fine - - or these court
> costs and that restitution in equal monthly installments, I'm going to put
> you in jail; you understand me?
>
> THE DEFENDANT:  Yes, sir.
>
> THE COURT:  Do you have any questions whatsoever?
>
> THE DEFENDANT: Quite clear.
>
> THE COURT:  You drop off the straight and narrow, Mr. Roulette, and
> you're gone, no matter what happens.
>
> THE DEFENDANT:  Thank you, your Honor.
>
> THE COURT:  We understand each other?
>
> THE DEFENDANT:  Quite Clear.
>
> THE COURT:  Fine.

*Id.* at 18-19.  It is noted that Roulette testified at Matthews's trial that he received no

consideration for his testimony.  Transcript at 215.  He further stated that he had not

entered a plea to the charges that were pending and he was probably going to go back to

prison.  *Id.* at 180, 213.  Roulette's reasoning for testifying was his friendship with Price

and being a good citizen and not to straighten out his own criminal problems.  *Id.* at 248.

At the time that Paxton met Matthews in the County Jail, Paxton had already pled guilty to separate charges of theft and extortion.[1]  *State of Ohio v. Matthews,* 1999 WL 135264, *1 (Ohio App. 8 Dist. March 11, 1999).   Both of these crimes are third degree felonies.  Paxton also had a prior grand theft conviction from 1983.  Submission of Additional Documents to Expand the Record, exhibit 2.  On May 21, 1990, prior to Matthews's trial, Paxton was sentenced to one year in prison in the first case and eighteen months in prison on the second case.  The sentences were to run concurrently.

On August 16, 1990, just ten days after Matthews was sentenced for Price's murder, Paxton's attorney filed a motion to withdraw the guilty pleas in the above cases.  The motion was based on the argument that Paxton was not properly advised that his guilty pleas would make him a parole violator, thus causing the sentences to be served consecutive to what the Parole Board imposed.  However, in both Paxton's plea hearing and his sentencing, the court discussed that the guilty pleas could be a violation of his parole.  *Id.*, exhibit 2, at 13-14, & exhibit 3, at 5.

A hearing was held the day after Paxton's motion to withdraw his guilty plea was filed.  Prosecutor Marino appeared on behalf of the State, although he had not been involved in the cases prior to that time, and made no objection to the motion.  However, instead of Paxton facing the charges that he had been previously charged with, Prosecutor Marino conveniently offered two amended indictments to the court stating that Paxton was prepared to plead to the amended indictments.  Paxton then pled guilty in the first case to petty theft, a first degree misdemeanor, and coercion, a second degree misdemeanor.  Before sentencing on these counts, Paxton's attorney stated, "Your honor,

---

[1] Paxton entered guilty pleas to the offenses on May 2, 1990.  Submission of Additional Documents to Expand the Record, exhibit 2.

I would just like the Court to take into account the cooperation that Mr. Paxton has shown to the State before it imposes its sentence." Paxton was given a suspended sentence of six months and ninety days, respectively, to be served concurrently, and five years probation. Immediately after the sentences were passed, the trial court judge stated on the record, "Let me make one thing very, very clear to you. You know, the prosecutor knows, defense counsel knows, and the Court knows why this plea bargain has been worked out." Paxton also testified at Matthews's trial that he received no consideration for his testimony.

Once Matthews was convicted of Price's murder, he filed a timely notice of appeal. On November 27, 1990, Matthews also filed a motion for a new trial with the trial court. The basis for the motion was prosecutorial misconduct and the Roulette plea agreement. The trial court denied the motion for a new trial and the appeal from that judgment was consolidated with Matthews's pending appeal. The claims in his direct appeal included: (1) the verdict was against the weight of the evidence; (2) trial court erred by allowing prejudicial other acts evidence to be introduced; and (3) prosecutorial misconduct throughout the trial and in closing arguments denied Matthews his Fourteenth Amendment Due Process right to a fair and impartial trial; and (4) the trial court erred by denying the motion for a new trial. *State of Ohio v. Matthews,* 609 N.E.2d 574, 577 (Ohio App. 1992). It is noted that although the State of Ohio was aware that Matthews's argument was that a plea agreement had been entered into with Roulette and had remained undisclosed to the defense, the State did not inform Matthews or the appellate court about the circumstances surrounding Paxton.

On April 19, 1991, Matthews filed a "Motion for Order Finding that Defendant was Unavoidably Prevented from Discovering Evidence" and a second motion for a new trial with the trial court.  The basis for this motion was a claim that another person had confessed to the murder of Price.  These motions were denied by the trial court.  No appeal was taken on this ruling.

On June 1, 1992, the Ohio Court of Appeals for the Eight District affirmed the trial court's judgment in what it called a "borderline" decision.  A more in depth discussion of the ruling is provided later in this Opinion.  The decision was appealed to the Supreme Court of Ohio, who dismissed the appeal sua sponte as having no substantial constitutional question.

Matthews filed with the trial court a "Motion for Order Finding that Defendant was Unavoidably Prevented from Discovering Evidence".   In support of his motion, Matthews submitted the deposition testimony of Roulette, stating that he: (1) recanted his prior trial testimony; (2) denied that he was a witness to the crime; (3) had lied under oath at trial; and (4) had made a deal with the prosecutor prior to testifying.  The trial court denied the motion and no appeal was taken against this ruling.

On June 21, 1995, after discovering that Paxton had withdrawn his previously entered guilty plea after the completion of Matthews's trial, Matthews filed another motion for a new trial.  The basis for the motion was the alleged plea agreement with Paxton and a claim of ineffective assistance of counsel.  The trial court judge held a

hearing on the motion and issued an order granting a new trial based on the Paxton plea.[2]
The prosecution appealed the order.[3]

Three assignments of error were raised in this appeal: (1) the trial court erred in
granting the defendant's motion for a new trial based on *res judicata* and/or issue
preclusion, or that collateral estoppel barred the granting of the motion; (2) the trial court
abused its discretion by granting the defendant's motion for a new trial; and (3) the trial
court erred because there was no basis for the granting of defendant's motion for a new
trial.

On appeal, the prosecution argued that the trial court abused its discretion by
granting a new trial and erred as there was no basis for doing so. *Matthews,* 1999 WL
135264, at *3. The appellate court noted that during the hearing before the trial court on
the motion for a new trial, Matthews argued that he did not discover the Paxton deal
because it was "inconceivable that Paxton would be allowed to withdraw his guilty plea,
almost ninety days after sentencing" despite the fact that he had discovered that Roulette
had received consideration for his trial testimony. *Id.,* at *4. The appellate court found
that this explanation was insufficient to satisfy the standards for granting a new trial
under Crim. R. 33 because the information was public record. *Id.* Because of this, the
appellate court found that Matthews had not exercised due diligence in discovering
Paxton's deal within the 120 day period provided for under Crim. R. 33. *Id.* Therefore,
the trial court's order granting a new trial was reversed. *Id.* The appellate court did,
however, remand the case to the trial court for a determination on the issue of whether

---

[2] The trial court did not address Matthews's claim of ineffective assistance of counsel.
[3] The prosecution originally appealed the trial court's order granting the motion for a new trial. On May
28, 1996, the appellate court denied the motion for leave to appeal. On May 6, 1998, the Ohio Supreme
Court reversed the appellate court decision and remanded the case for review of the merits of the appeal.

appellate counsel was ineffective by failing to discover the Paxton deal within the 120 day time period.[4]

Matthews filed his Petition of Habeas Corpus with this Court on August 27, 2001. The basis for his Petition is a claim of prosecutorial misconduct alleging the following facts: (1) the prosecutor withheld that deals were made with witnesses; (2) the prosecutor's response to Matthews's pretrial motion for discovery was that the witnesses would not receive any consideration for their testimony; (3) the prosecutor and the witnesses stated at trial that no deals were made; and (4) the prosecutor stated to the court and jury that no deals would be made after the trial was completed.

The Warden filed an Answer/Return of Writ in response to the Petition. The first argument raised is that Matthews procedurally defaulted part of his habeas claim by failing to include the factual allegations surrounding Paxton in his direct appeal.[5] The Warden points out that it wasn't until Matthews's final motion for a new trial, several years after the direct appeal, that he raised issues surrounding Paxton. Even though the trial court granted the motion, that ruling was reversed on appeal based on a procedural default.[6] Therefore, the Warden argues, this Court is barred from considering this issue on Matthews's habeas claim because it has been procedurally defaulted.

## II. Procedural Default

---

[4] Although this issue was remanded for determination by the trial court, it has failed to address this issue as of this date.

[5] Although Matthews's claims regarding Roulette would ordinarily not be reviewable in this habeas action as they were not filed within one year after exhaustion of the issue in the state courts, 28 U.S.C. §2244(d)(1), the Warden has failed to make this claim and therefore has waived the argument pursuant to *Scott v. Collins*, 286 F.3d 923, 927 (6th Cir. 2002).

[6] It could be argued that Matthews has failed to exhaust this claim or has procedurally defaulted it because he did not appeal the 8th District's ruling on his post conviction motion to the Ohio Supreme Court. However, it would be fruitless to dismiss this action to allow Matthews to pursue a delayed appeal with the Ohio Supreme Court because there is no procedure in the State of Ohio for a delayed appeal on a post conviction motion. Additionally, neither party has addressed the issue of whether the claim would be procedurally defaulted for this reason. Therefore, because this specific defense has not been raised, it has been waived.

When determining whether a claim has been procedurally defaulted, this Court must look to the test set out in *Maupin v. Smith,* 785 F.2d 135 (6th Cir. 1986). Under *Maupin,* a district court must determine: (1) "that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule"; (2) "whether the state courts actually enforced the state procedural sanction"; and (3) "whether the state procedural forfeiture is an 'adequate and independent' state ground on which the state can rely to foreclose review of a federal constitutional claim." *Id.* at 138. If the court finds all of the above factors in the affirmative, the claim has been procedurally defaulted unless the habeas petitioner can demonstrate under *Wainwright v. Sykes*, 433 U.S. 72 (1977), that there was 'cause' for him to not follow the procedural rule and 'actual prejudice' that resulted from the alleged constitutional error. *Id.* Additionally, a court may consider procedurally defaulted claims if the habeas petitioner demonstrates "that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson,* 501 U.S. 722, 750 (1991).

In his final motion for a new trial before the trial court, Matthews alleged that the prosecution failed to notify him that Paxton received consideration for his testimony. Although Matthews's motion for a new trial was granted by the trial court,[7] the state appellate court reversed that decision. *Matthews,* 1999 WL 135264, at *4. In barring review of the claim on its merits, the appellate court used Ohio Rule of Criminal Procedure 33. *Id.* Rule 33 states in pertinent part:

> RULE 33. New Trial
>
> (A) Grounds. A new trial may be granted on motion of the defendant for any of the following causes affecting materially his substantial rights: . . .

---

[7] It is noted that the state trial court never addressed whether Matthews was unavoidably prevented from discovering evidence of the Paxton deal.

(2) Misconduct of the . . . prosecuting attorney . . .

(6) When new evidence material to the defense is discovered, which the defendant could not with reasonable diligence have discovered and produced at the trial. . . .
(B) Application for a new trial shall be made by motion which, except for the cause of newly discovered evidence, shall be filed within fourteen days after the verdict was rendered, . . . , unless it is made to appear by clear and convincing proof that the defendant was unavoidably prevented from filing his motion for a new trial, in which case the motion shall be filed within seven days from the order of the court finding that the defendant was unavoidably prevented from filing such motion within the time provided herein.
   Motions for new trial on account of newly discovered evidence shall be filed within one hundred twenty days after the day upon which the verdict was rendered, or the decision of the court where trial by jury has been waived.  If it is made to appear by clear and convincing proof that the defendant was unavoidably prevented from the discovery of the evidence upon which he must rely, such motion shall be filed within seven days from an order of the court finding that he was unavoidably prevented from discovering the evidence within the one hundred twenty day period.

Ohio R.Crim.P. 33.

In looking to Matthews's failed compliance with the above rule the appellate court evaluated his explanation for failing to discover Paxton's deal for almost five years. *Matthews,* 1999 WL 135264, at *3.  The appellate court determined that Matthews did not exercise reasonable diligence in discovering the existence of Paxton's deal.  *Id.*  It stated that because Matthews's attorney discovered that another witness, Roulette, had entered into a plea agreement with the prosecution and that issue was raised in his direct appeal, evidence of Paxton's deal was discoverable within the time limitation given in Rule 33 because each was public record.[8]  *Id.*

Because it is uncontested that Matthews failed to comply with the requirements of Rule 33(B) and because the rule was the basis for the appellate court decision, the first

---

[8] The appellate court did not discuss the time limitations under Rule 33(A)(2) for a claim of prosecutorial misconduct.

13

two *Maupin* factors are present.  Matthews argues that the third *Maupin* factor is not fulfilled because Rule 33 is not generally enforced and is therefore not an "adequate and independent" ground for the State to foreclose review of the federal constitutional claim. Matthews bases this argument on *State of Ohio v. Johnson,* 529 N.E.2d 898 (1988).

Matthews argues that the Ohio Supreme Court ignored the requirements of Criminal Rule 33 in *Johnson*, and ruled on the merits of the claim.  However, in that case, the Ohio Supreme Court did not ignore the requirements of the Rule but found that the trial court's ruling on the merits of the case without making a finding regarding timeliness under the rule was not an abuse of discretion thus allowing the appellate court to also review the merits of the motion.  *Id.* at 909-910.

"A state procedural rule is adequate if it was firmly established and regularly followed by the time it was applied in th[e] case."  *Monzo v. Edwards,* 281 F.3d 568, 577 (6th Cir. 2002).  In this action, the procedural rule was applied by the appellate court in March of 1999.  Therefore, this Court cannot look to any cases ruled on after that date.

Ohio Rule of Criminal Procedure 33 became effective on July 1, 1973.  Therefore, the Rule was clearly established at the time it was used.  Additionally, after a review of Ohio case law, this Court finds that Rule 33 is regularly followed although there are a few exceptions.  *State of Ohio v. Parks,* 1996 WL 325277 (Ohio App. 1996) (affirming the trial court's denial of the motion for a new trial under Rule 33); *State of Ohio v. Blankenship,* 675 N.E.2d 1303 (Ohio App. 1996) (Upholding the trial court's denial of a motion for a new trial even though the court ruled on the merits of the motion without addressing the timeliness of it.  The appellate court stated that the trial court implicitly found the motion timely if it ruled on the merits and found no abuse of discretion in

14

doing so.); *State of Ohio v. Roger*, 1993 WL 215436 (Ohio App. 1993) (Affirming the trial court's denial of the motion for a new trial based on the time limitations in Rule 33. Appellate court found that there was no evidence presented to show that the defendant was unavoidably prevented from discovering the evidence.); *State of Ohio v. Casey,* 1991 WL 97797 (Ohio App. 1994) (Affirming the trial court's denial of the motion for a new trial based on the time limitations in Rule 33.  Appellate court found that there was no evidence presented to show that the defendant was unavoidably prevented from discovering the evidence.); *State of Ohio v. Hoeflich,* 1990 WL 93909 (Ohio App. 1990) (affirming the trial court's denial of the motion for a new trial); *State of Ohio v. Schiebel,* 35 Ohio St.3d 71, 75 (1990) (Appellate court's decision reversed and trial court's decision denying the motion for a new trial is affirmed where the defendant did not present clear and convincing evidence that he was unavoidably prevented from discovering the evidence within the time allotted under Rule 33) *State of Ohio v. Miller,* 1987 WL 11110 (Ohio App. 1987) (affirming the trial court's denial of the motion for a new trial); *State v. Gartner,* 1986 WL 11339 (Ohio App. 1986) (affirming the trial court's denial of the motion for a new trial); *State of Ohio v. Shepard*, 468 N.E.2d 380 (Ohio App. 1983) (upholding trial court's denial of motion for a new trial finding that defendant did not produce sufficient evidence to show that he exercised reasonable diligence in discovering the new evidence); *State of Ohio v. Parry,* 1983 WL 7015 (Ohio App. 1983) (affirming trial court's denial of the motion for a new trial); *State of Ohio v. Fambrough,* 1984WL 5322 (Ohio App. 1984) (affirming trial court's denial of the motion for a new trial); *State of Ohio v. Martin,* 1979 WL 206895 (Ohio App. 1979) (affirming trial court's denial of the motion for a new trial finding that the defendant did not demonstrate the

evidence wasn't available within the time limitations under Rule 33); *State v. Thorpe,* 1979 WL 209179 (Ohio App. 1979) (affirming the trial court's denial of the motion for a new trial finding that the evidence presented was not 'newly discovered'); *State of Ohio v. Bratcher,* 1981 WL 10005 (Ohio App. 1981) (upholding trial court's denial of motion for a new trial finding that there was no evidence on the record to demonstrate that the defendant was unavoidably prevented from discovering the evidence within the time allotted); *State of Ohio v. Snyder,* 1980 WL 355116 (Ohio App. 1980) (upholding the trial court's denial of a motion for new trial finding that defendant failed to demonstrate that he was unavoidably prevented from discovering the evidence within the time allotted); *State of Ohio v. Hartson,* 1978 WL 218059 (Ohio App. 1978) (upholding the trial court's denial of a motion for new trial finding that the defendant failed to demonstrate that he was unavoidably prevented from discovering the evidence within the time allotted); *State of Ohio v. Kerner,* 1977 WL 200557 (Ohio App. 1977) (upholding the trial court's denial of a motion for new trial finding that defendant failed to demonstrate that he was unavoidably prevented from discovering the evidence within the time allotted); *State v. Kiraly,* 381 N.E..2d 649 (Ohio App. 1977) (affirming trial court's denial of the motion for a new trial); *State of Ohio v. Conway,* 1976 WL 190464 (Ohio App. 1976) (affirming trial court' denial of the motion for a new trial).

Because the claim was procedurally defaulted in the state courts, Matthews must demonstrate 'cause' and 'actual prejudice' for failing to comply with the procedural rule or demonstrate that a fundamental miscarriage of justice would occur if this Court were to not consider the claim.  The "cause and prejudice" standard is a two-part test where the petitioner must: (1) "present a substantial reason to excuse the default," *Coleman,* 501

U.S. at 754; and (2) "show that he was actually prejudiced as a result of the claimed constitutional error." *Martin*, 280 F.3d at 603-604. The Supreme Court stated, in *Murray v. Carrier*, 477 U.S. 478 (1985), that "the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Id*. at 488. The Supreme Court further provided two examples of when "cause" would be shown: (1) when a petitioner demonstrates that a factual or legal basis for the claim was not reasonably available to counsel; or (2) when a petitioner demonstrates that there was some interference from officials which made compliance with the state procedural rule impracticable. *Id.*

To demonstrate 'prejudice' the petitioner must make a showing that the errors at trial "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1981) (emphasis omitted). If a petitioner is unable to show "cause" and "prejudice" for a procedural default, a federal court cannot reach the merits of the habeas claim unless the petitioner can demonstrate that "refusal to consider his claim would result in a fundamental miscarriage of justice." *Id.* "The fundamental miscarriage of justice exception requires a showing that in light of the new evidence no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Martin,* 280 F.3d at 603-604 (citing *Schlup v. Delo,* 513 U.S. 298, 329 (1995)) (internal quotations omitted).

Matthews argues that "cause" exists because he was prevented from discovering the issues surrounding Paxton's deal due to the prosecutor's failure to disclose this

information and his reliance on the prosecutor's statements at trial that no deals would be made in the future.  Although the Warden presents the correct standard for a "cause" and "prejudice" analysis, he does not present an argument as to why "cause" does not exist. The Warden merely states that Matthews procedurally defaulted this claim because he failed to include the allegations surrounding Paxton's alleged deal in his direct appeal.

The facts of the case demonstrate that Paxton was allowed to withdraw his prior guilty plea after Matthews's trial was completed and just days after Matthews was sentenced for murder.  This was almost 90 days after Paxton had been sentenced to 18 months in prison for theft and extortion.  At trial, Prosecutor Marino repeatedly assured the jury that no pleas had been or would be made with either Paxton or Roulette.  While Matthews's case was on appeal in 1992, the prosecution had direct knowledge that Paxton had been permitted to withdraw his prior guilty pleas and be re-sentenced but chose not to disclose that information to Matthews even though one of the issues on appeal was the Roulette deal.

The Supreme Court has made clear that adverse counsel can rely on prosecutors to live up to their obligations.  *See Strickler v. Greene,* 527 U.S. 263 (1999) ("The presumption, well established by tradition and experience, that prosecutors have fully discharged their official duties is inconsistent with the novel suggestion that conscientious defense counsel have a procedural obligation to assert constitutional error on the basis of mere suspicion that some prosecutorial misstep may have occurred." (internal citations and quotation marks omitted)).  Therefore, Matthews and his counsel could rely on the statements made by the prosecutor prior to and during trial that no deal had or would be made with Paxton.  Additionally, the Supreme Court, in *Banks v. Dretke,*

540 U.S. 668, 696 (2004), rejected the state's argument that the cause inquiry should be based on the petitioner's conduct, including an alleged lack of diligence in pursing a *Brady* claim.  *Id.,* at 696.  The Supreme Court stated that "[a] rule . . . declaring [that a] 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process."  *Id.*  The Court concluded, "because the State persisted in hiding [the witness's] informant status and misleadingly represented that it had complied in full with its *Brady* disclosure obligations, Banks had cause for failing to investigate, in state post conviction proceedings, [the witness's] connections to [the police]."  *Id.* at 693.

In a 'cause' analysis, the question is whether there was an objective factor external to the defense which impeded counsel's efforts to comply with the state procedural rule.  The facts listed above demonstrate that the prosecution directly impeded Matthews and his counsel's ability to comply with the state procedural rule by not disclosing the facts surrounding Paxton's withdrawal of his guilty plea, plea to reduced charges and re-sentencing.  Therefore, it is determined that Matthews has demonstrated "cause" for not following the requirements of Ohio Crim. R. 33.

The next issue is whether Matthews was actually prejudiced by the constitutional error, or more narrowly stated, did Matthews's inability to present to the jury the fact that Paxton had received some consideration for his testimony work to his actual or substantial disadvantage, infecting the entire trial with error of constitutional dimensions? In this case there were only two witnesses that linked Matthews to the crime, Paxton and Roulette.  There was no physical evidence implicating that Matthews committed the

murder.  Therefore, the testimony of these two witnesses was essential to Matthews's conviction.

As previously stated, Paxton was a 'jailhouse informant.'  He testified that Matthews confessed to him, while the two were in jail, that he committed the murder. Additionally, Paxton provided the only motive for the crime and the main link between Price and Matthews.  No other witness testified that Matthews had a prior relationship with Price.  Even Germany's testimony, Price's common law wife, indicated no prior relationship between Matthews and Price.  The fact that Paxton would be permitted to withdraw a prior guilty plea, which resulted in prison time, and enter a plea to substantially reduced offenses,[9] receiving probation, just days after testifying against Matthews placed Matthews at a substantial disadvantage.  As the prosecuting attorney stated in closing argument, this case came down to one of credibility of witnesses.  This inability for defense counsel to introduce evidence of Paxton's deal with the prosecution to the jury infected the entire trial, resulting in Matthews failing to receive his constitutionally protected right to a fair trial.

Based on the reasons stated above, the Court finds that although Matthews procedurally defaulted his claim regarding Paxton, he has demonstrated 'cause' for failing to follow the procedural rule and 'actual prejudice' which resulted from the constitutional error.  Therefore, it is unnecessary to reach the issue of manifest injustice and the Court is free to consider the Paxton deal when reviewing Matthews's habeas petition.

---

[9] As stated prior, Paxton had originally pled guilty to two third degree felonies.  After he was permitted to withdraw his guilty pleas, Paxton pled guilty to two amended indictments, which reduced the charges to one first degree misdemeanor and one second degree misdemeanor.

Because it has been determined that all of Matthews's claims are properly reviewable by this Court in his habeas action, the Court must determine whether, based on the merits of his claims, the Petition should be granted.

### III. Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")

Because the Petition was filed after 1996, it would ordinarily fall under the standards set forth under the AEDPA.  28 U.S.C. §2254.  Section 2254(d) provides as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. §2254(d).

State court decisions are the starting point for habeas review under 28 U.S.C. §2254(d).  *Moore v. Morton,* 255 F.3d 95 (3rd Cir. 2001).  In this case, the Ohio Court of Appeals for the Eight District was the highest state court to review Matthews's claims regarding Roulette in 1992.  That court did not directly address whether Matthews was denied his right to a fair trial based on a *Brady/Giglio* violation.  In that opinion, the appellate court reviewed the Roulette claim under a prosecutorial misconduct analysis and applied the law set out in *State of Ohio v. Totty,* Cuyahoga App. No. 47152, unreported, 1983 WL 2920 (Ohio App. Dec. 14, 1983).  The Sixth Circuit recently stated, in *Howard v. Bouchard,* 405 F.3d 459 (6th Cir. 2005), that where a state court did not address or resolve a claim based on federal law, it has not been "adjudicated on the

merits" and is therefore not subject to the standards set out under the AEDPA and is

subject to a de novo review by the reviewing habeas court.  *Id.* at 467.

 The Warden argues that the appellate court did consider the merits of this claim

even if not under a *Brady/Giglio* analysis.  Answer/Return of Writ, p. 16.  The appellate

decision provides a brief discussion of the issue:

> At trial, Theodore Roulette denied that he had any kind of plea
> agreement with the state regarding his pending cases.  Furthermore, the
> assistant county prosecutor adamantly denied that at the time of trial any
> kind of an agreement had been made in exchange for his testimony.
> Unfortunately, the assistant county prosecutor "lives his life as morally as
> the jurors" and thus we must conclude that the deal was made after the
> trial.  Therefore, the assistant county prosecutor would not have been able
> to disclose any plea arrangements, as they were not made until after the
> trial.
>  The sequence of events subsequent to the trial create a strong inference
> that Roulette, the sole eyewitness, did receive consideration for his
> testimony.  Despite being indicted for seven felony charges, Roulette was
> permitted to enter a plea of guilty to three misdemeanors and was placed
> on probation.
>  If in fact Roulette received this consideration in exchange for his
> testimony, these facts should have been disclosed to appellant and his
> counsel.  The problem is compounded when one considers the fact that
> appellant was not indicted until after Roulette came forward and gave his
> statement.  When this court considers the criteria of *Totty, supra*, the
> decision is borderline.  The scale is only tipped towards affirmance
> because appellant's counsel on numerous occasions alluded to the fact that
> consideration was given to both Paxton and Roulette.  Counsel for
> appellant clearly created such an inference for the jury's contemplation
> with his cross-examinations and closing arguments.

*Matthews,* 609 N.E.2d at 579.  The Court notes that this portion of the appellate decision

is quite confusing by first stating that the court found no deal was made prior to trial but

then finding the subsequent events create a strong inference that Roulette did receive

consideration for his testimony and finally ending with the conclusion that if

consideration was received in exchange for his testimony, it should have been disclosed

to Matthews and his counsel.  The dissent, perhaps, lends some guidance as to what is

being said by the majority:

> The record is clear, **and the majority correctly recognizes,** that at least as
> to Roulette (the sole eyewitness to the shooting), an understanding between
> the state and the witness had been reached at the time of this trial regarding
> Roulette's present testimony and considerations to be extended by the state
> on his behalf in sentencing on a pending unrelated multiple felony case.

*Id.* at 580 (emphasis added).  If the opinion is read in total, it appears that the appellate

court did determine that a deal existed between Roulette and the prosecution at the time

of Matthews's trial but found that under *Totty,* Matthews received a fair trial.  However,

as stated previously, the *Totty* case has no basis in federal law.  Additionally, the factors

used by the appellate court to determine whether prosecutorial misconduct occurred are

not based in federal law.[10]  Therefore, based on the holding of *Howard v. Bouchard*, this

Court must perform a de novo review of the claim as there has been no "adjudication on

the merits."[11]  *Id.* at 467.  It is, however, noted that the appellate court's finding of fact

---

[10] The appellate court cited *State v. Hill,* 370 N.E.2d 775 (Ohio App. 1977) as its authority for the factors to consider for a prosecutorial misconduct claim when deciding whether a defendant has received a fair trial. However, the *Hill* court cites no authority for those factors.

[11] It could be argued that the intermediate standard of review set out in *Howard v. Bouchard* would be applicable as was done in the recently decided *Maldonado v. Wilson,* --- F.3d ---, 2005 WL 1654766, No. 03-4528 (6th Cir. 2005).  In *Maldonado,* the state appellate court determined that although evidence was admitted that should not have been, the error was not prejudicial to the defendant.  *Id.* at *4-5.  In reviewing the habeas petition, the 6th Circuit stated that although the state court was silent on whether its harmless error standard was based in state evidence law or federal constitutional law, the modified AEDPA deference standard set forth in *Howard* was applicable because the defendant had presented a constitutional claim, the state court's prejudice inquiry "bore some similarity to a determination, under the Due Process Clauses of the Fifth and Fourteenth Amendments, of whether the admission of the challenged evidence rendered the trial fundamentally unfair."  *Id.* at 6.  In a footnote, the 6th Circuit referred to the case the state opinion had been based on, *State of Ohio v. Rowe,* 589 N.E.2D 394 (Ohio App. 1990), stating that although *Rowe* does not equate the prejudice inquiry under Ohio law with the constitutional issue of whether the defendant received a fundamentally unfair trial under the Due Process Clause, other Ohio cases which are cited in *Rowe* do make the connection.  *Id.* at 5-6, n. 3.

    *Maldonado*, however, can be distinguished from the case at bar.  In the 1992 decision, the state appellate court in this case based its opinion only on Ohio appellate law from *State of Ohio v. Totty,* Cuyahoga App. No. 47152, unreported, 1983 WL 2920 (Dec. 14, 1983).  There is no reference to federal law in *Totty*, nor is there any reference to federal law in any cases cited therein.  Therefore, with no basis in federal law, even a tenuous one, this Court cannot find that the intermediate standard set forth in *Howard* would be applicable to the case at bar.

that a deal was reached with Roulette prior to trial is presumed to be correct under §2254(e)(1) absent a showing of clear and convincing evidence. *Appel v. Horn,* 250 F.3d 203 (3rd Cir. 2001).

Additionally, because the trial court's granting of a new trial based upon the Paxton claim was reversed on appeal, the Paxton claim has not been "adjudicated on the merits" and is therefore not subject to the standards set out under the AEDPA and is subject to a de novo review by this Court.[12] *Id.*

**IV. Review on the Merits**

This Habeas Petition presents a unique set of circumstances. Matthews argues that there was prosecutorial misconduct so severe as to result in an unfair trial based on what he alleges were deals made by the prosecution with the two key witnesses in the case, Roulette and Paxton. What is unique, which has been briefly discussed herein, is that the collective effect of the alleged deals on Matthews's trial has never been addressed. Roulette was the subject of the appellate court decision issued in 1992 and Paxton was the subject of the appellate court's decision issued in 1999. What makes this an unfortunate situation is that Paxton's testimony at trial was used by the appellate court, in the initial appeal, as one of the main reasons for finding that the conviction was not against the manifest weight of the evidence:

There are two very key pieces of evidence that this court believes tips the

---

[12] This Court also notes that the 10th Circuit was faced with a similar habeas petition where there had been a direct appeal and an appeal on a post conviction motion, both of which involved different evidence. *Cargle v. Mullin,* 317 F.3d 1196 (10th Cir. 2003)  The court determined that because neither of the prior appellate decisions addressed the cumulative effect of the different constitutional errors, a pre AEDPA standard applied. *Id.* at 1206. The court stated that the standard set forth under §2254(d)(1) of whether the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" was not controlling because it is applicable "only when there is an antecedent state court decision on the same matter." *Id.* If this standard were applied in this case, it would be determined that there is no antecedent state court decision which addresses both issues. Thus, as found above, this court would be required to apply a pre-AEDPA standard.

scales toward a conviction not being against the manifest weight of the evidence. The first is that Paxton testified that appellant told him that he shot Wayne Price twice. The autopsy protocol reflects that appellant was indeed shot *twice*. In contradiction of appellant's theory that Paxton could have gotten his information from the media, the number of times the decedent was shot is probably not a fact reported in media accounts. Indeed it could be, but it is in the opinion of this court extremely probable that Paxton would not know such a detail unless appellant told him. The second is Paxton's knowledge of a "Juanita" and the fact that she was a witness to the shooting. The media accounts, on this issue, if any probably would have portrayed her as the killer since she was initially indicted for the murder and was not a witness. The fact that Paxton would also know that "Juanita" was involved is also an extremely probative fact in this court's opinion.

*Matthews,* 609 N.E.2d at 579.

Certainly, viewing the effect of the testimony of only one of the two main witnesses would have significantly less impact on a reviewing court than viewing them in the aggregate. It is additionally noted that these two witnesses are Matthews's only connection to the crime. The prosecution presented no firearm, no fingerprints, no DNA evidence, and no other witnesses connecting Matthews to Price. Based on the evidence presented at trial, Matthews was convicted based solely on the eyewitness account of Roulette and the jailhouse confession offered by Paxton. Therefore, the Court looks to the facts surrounding *both* of these witnesses to determine whether Matthews's Petition should be granted.

Matthews claims that although his attorney made a written request for disclosure of any favorable evidence prior to trial, the prosecution failed to disclose that both Roulette and Paxton received a deal in exchange for their trial testimony. The Warden does not dispute that such a request had been made but argues that no deal existed with these witnesses prior to Matthews's trial and thus there was no duty to disclose. The Warden further claims that the only evidence to support this claim is the sequence of

events occurring after the trial, which the Warden argues is insufficient to support a
*Brady/Giglio* claim.  This brings two questions before the Court:  (1) based on the
evidence surrounding Roulette's plea and Paxton's change of plea, did the prosecution
enter into plea agreements with these witnesses prior to their testifying at Matthews trial;
and (2) if so, did the prosecution's failure to disclose this evidence result in Matthews
being deprived of his constitutional right to a fair trial.

When looking only to the facts surrounding Roulette's plea agreement, on first
glance, there does not appear to be affirmative evidence demonstrating that he received
an undisclosed deal prior to Matthews's trial.  Roulette was indicted on the charges fairly
near the time Matthews's trials were held.  There also does not appear to be a significant
period of time that the charges remained pending.  What is curious about Roulette's plea
is that he was originally indicted on serious violent felonies, which posed mandatory
prison time.  However, after Roulette testified in Matthews's trial, he was permitted, with
Prosecutor Marino's approval, to plead to three misdemeanors, given a suspended
sentence and placed on probation.  This Court would also be remiss if it failed to mention
that, as previously stated, it appears from the 1992 appellate court decision that the
appellate court was of the mindset that Roulette received undisclosed consideration in
exchange for his testimony.

Perhaps, if this were the only basis for the Petition, the Court may find that even if
this agreement remained undisclosed, such would not be sufficient to form the basis for
an unfair trial claim.  Without more, this Court may find, as the appellate court did, that
the testimony of Paxton was sufficient on its own to convict Matthews.  However, unlike

26

with the 1992 appellate court, this Court is presented with the allegation that an undisclosed plea agreement was also entered into with Paxton.

The facts surrounding Paxton's plea agreement are much more significant than those surrounding Roulette.  Prior to Matthews's trial, Paxton had pled guilty to two third degree felonies and been sentenced to serve prison time.  However, merely days after Matthews's sentencing, Paxton's attorney filed a motion that appears to be a ruse. Paxton's motion was based on his lack of knowledge that his guilty pleas would result in a parole violation, a fact that was discussed by the court at both his plea and his sentencing.  Additionally, Prosecutor Marino appeared, for the first time, representing the prosecution in Paxton's case, makes no objection to the motion and conveniently has prepared and presents to the court amended indictments reducing the charges to two misdemeanors.  It is also Prosecutor Marino who informs the court that Paxton was prepared to enter into guilty pleas to the amended indictments.  And Paxton, who has been serving time in the penitentiary, is given probation.  It is also important to point out the implication behind the judge's words at the change of plea, "Let me make one thing very, very clear to you.  You know, the prosecutor knows, defense counsel knows, and the Court knows why this plea bargain has been worked out."  Submission of Additional Documents to Expand the Record, exhibit 4.  It appears to this Court that the judge was aware that this plea was entered into in exchange for Paxton's testimony.

What appears remarkable is that by presenting Paxton to the jury as a person who had nothing to gain by testifying and blinding the jury to the fact that after Matthews's trial he would be permitted to withdraw his guilty pleas, plead to amended indictments, and be sentenced to probation rather than prison, Prosecutor Marino significantly

enhanced the credibility of this witness.  Additionally, the facts surrounding this witness's plea agreement lends credence to the argument that Roulette also received an undisclosed plea agreement for his testimony.   This Court has little doubt that both witnesses did indeed receive what Prosecutor Marino claimed to the trial court and the jury they would not, consideration for their testimony.  The question, however, this Court must address is whether the prosecution's failure to disclose this evidence resulted in an unfair trial.

In reviewing the claim de novo, this Court looks to *Brady v. Maryland,* 373 U.S. 8 (1963), which provides that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  *Id.* at 87 The purpose behind the rule is to avoid an unfair trial.  *Id.*  Additionally, it has been long established that the "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with the 'rudimentary demands of justice.'"  *Giglio v. United States,* 405 U.S. 150, 153 (1972) (quoting *Mooney v. Holohan,* 294 U.S. 103, 112 (1935) (*per curiam*)).  The Supreme Court has held that this rule is applicable to both exculpatory and impeachment evidence.  *United States v. Bagley,* 473 U.S. 667, 676 (1985)).  The Supreme Court has further held that a constitutional violation occurs if the evidence the government has failed to disclose bears on a witness' credibility and might be helpful to the defendant during cross-examination.  *Id.* at 678; *Giglio,*  405 U.S. at 154-155.

Additionally, to establish a claim of prosecutorial misconduct or denial of due process, Matthews must demonstrate that the statements that the witnesses received no

deals for their testimony were actually false, that the prosecution knew they were false, and that the impeachment evidence was material.  *Byrd v. Collins,* 209 F.3d 486, 517 (6th Cir.2000).

As stated above, this Court finds that undisclosed plea agreements had been entered into by the prosecution and both witnesses prior to trial.  Therefore, both Roulette and Paxton's statements that they received no deals for their testimony were actually false.  Additionally, because Prosecutor Marino was an intricate part of these witnesses plea agreements, with Roulette – providing his approval to the plea agreement and with Paxton – actually appearing in the case, giving no objection to the withdrawal of the pleas, offering amended indictments, and not objecting to the imposition of probation, there is no question that the prosecution knew that the witnesses statements that no deals had been entered into prior to trial were false.  The question becomes whether this impeachment evidence was material.

The Sixth Circuit has followed the Second Circuit's determination that "'where the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence, the undisclosed evidence may be cumulative, and hence not material.'"  *Byrd v, Collins,* 209 F.3d 486, 518 (6th Cir. 2000) (quoting *United States v. Avellino,* 136 F.3d 249, 257 (2nd Cir. 1998)).

At Matthews's trial, the defense did present impeachment evidence against Roulette.  Roulette had testified that he stopped at the King-Kennedy Housing Project to obtain syringes from the roommate of his ex-wife, Evelyn Roulette.  However, the defense presented Evelyn Roulette, who contradicted that statement by testifying that she

had never introduced Roulette to her roommate.  *Matthews,* 609 N.E.2d at 577.  Evelyn

Roulette also testified that Roulette had not been to her apartment on the night in question

and that he was "a liar who could not see without his glasses."  *Id.*  Because the defense

offered other impeachment evidence against this witness, based on *Byrd*, it appears that

even though the prosecution did not disclose that Roulette received a deal in exchange for

testifying, this evidence would be merely cumulative and thus not material.

Additionally, there was also evidence the defense introduced at Matthews's trial

introduced to impeach Paxton.  The defense presented Francis Barrett, the man Paxton

claimed told him not to testify.  Barrett testified that his cell was next to Paxton's and he

never saw or heard Paxton being threatened by Matthews or any correction officers, as

Paxton had claimed.  Paxton had also testified that Matthews told him a Juanita had

witnessed the murder but that Matthews would ensure that she wouldn't testify.  The

defense presented Quanita Muwwakkil, who had been originally charged along with

Matthews for Price's murder.[13]  Ms. Muwwakkil testified that she did not know Price or

Matthews and did not witness any shooting on the evening in question.  Therefore, as

with Roulette, based on the holding in *Byrd,* because the defense offered other

impeachment evidence against this witness, even though the prosecution did not disclose

that Paxton received a deal in exchange for testifying, this evidence would ordinarily be

cumulative and thus not material.

However, this Court is persuaded by the Tenth Circuit's cumulative error

analysis.  *United States v. Toles,* 297 F.3d 959, 972 (10th Cir. 2002).  Under this type of

analysis, even though the undisclosed plea agreements appear to be cumulative and not

---

[13] It is unclear why Ms. Muwwakkil was originally charged along with Matthews for Price's murder but then the charges were later dismissed against her.

material when the witnesses are looked at individually, a court can look to the cumulative

effect of the evidence to determine whether the defendant was deprived of a fair trial.

*Id.; Cargle v. Mullin,* 317 F.3d 1196, 1206 (10th Cir. 2003); *Walker v. Engle,* 703 F.2d

959, 963 (6th Cir. 1983) (stating that under pre AEDPA standards, "Errors that might not

be so prejudicial as to amount to a deprivation of due process when considered alone,

may cumulatively produce a trial setting that is fundamentally unfair."); *see also Berger*

*v. United States,* 295 U.S. 78, 89 (1935) (finding that when a defendant is convicted on

weak evidence and the prosecuting attorney's misconduct is pronounced and persistent,

the probable cumulative effect of that misconduct on the trial "cannot be disregarded as

inconsequential").

      The cumulative effect of these witnesses on Matthews's trial was substantial.  As

stated prior, the prosecution did not have a weak case without these witnesses, it had *no*

case.  There was no evidence presented other than Roulette and Paxton's testimony that

connected Matthews to Price or his murder.  Therefore, the entire trial hinged on the

credibility of these two witnesses.  Even though the defense performed thorough cross-

examinations and presented testimony to impeach the credibility of the witnesses, these

are not substitutes for being able to present to the jury affirmative evidence that the only

testimony linking Matthews to the crime was tainted by self-interest.  *Giglio,* 405 U.S. at

154-55 (finding that a constitutional violation can occur if the prosecution fails to

disclose evidence directly related to a witness's credibility which might be helpful during

cross-examination); *Bagley,* 473 U.S. at 678 (finding that failure to disclose information

that might have been helpful in cross-examination can result in a constitutional violation

if the defendant can show that the offered inducements, if disclosed to the defense for its

use in trial, would have resulted in a different verdict); *United States v. Wong,* 78 F.3d 73, 79 (2nd Cir. 1996) (holding that impeachment evidence is material "if the witness whose testimony is attacked supplied the only evidence linking the defendant[] to the crime . . . or where the likely impact on the wtiness's credibility would have undermined a critical element of the prosecution's case.").

   It is additionally important to note that the witnesses' self-interests were considerable.  Roulette, who was facing seven felony charges was permitted to plead to three misdemeanors and received probation.  Paxton, who had pled guilty to two felony charges and was serving time in prison was permitted to withdraw his pleas, plead to amended indictments which charged only misdemeanors, was essentially released from prison and permitted to serve his time on probation.  Based on these reasons, there exists a reasonable probability that the outcome of Matthews's trial would have been different had this impeachment evidence been disclosed to the defense prior to trial.  The prosecution's suppression of the plea agreements with Roulette and Paxton undermines confidence in the jury's guilty finding and denied Matthews his constitutional right to a fair trial.  *Kyles,* 514 U.S. at 434.  Therefore, this Court finds that there has been a violation of Matthews's due process rights under *Brady v. Maryland,* 373 U.S. 83, 87 (1963).  *See Campbell v. Coyle,* 260 F.3d 531, 558 (6th Cir. 2001) (recognizing that if the prosecution withholds information that two informants, despite their testimony at trial, received deals for their testimony, such would be a violation of the defendant's due process rights under *Brady*).

Based on the above, it is hereby determined that habeas relief is warranted in this instance. Prosecutor Marino's misconduct[14] began when he failed to disclose to Matthews's trial counsel that Roulette and Paxton would receive consideration for their testimony. The misconduct escalated when he permitted the witnesses to falsely testify that they were not receiving consideration for their testimony. Finally, Prosecutor Marino's misconduct reached its peak when he emphasized the credibility of these witnesses during his closing argument and told the jury, referring to the defense's suggestion that these witnesses received deals in exchange for their testimony:

> The cross-examination of witnesses like Roulette and Paxton saying, well, what happens a year from now or two years from now when nobody else is around, means to suggest to you that we are going to surreptitiously behind your back stand here and tell you one thing and then lie to you; go to somebody else and a say now that the case is over let's give this guy a break. You know that's not fair really because we live our life as morally as you live yours. We accept your tax money to uphold the public trust.

*Matthews,* 609 N.E.2d at 578-579. In such a weak case, this Court finds that habeas relief, in this instance, is appropriate.

---

[14] It is noted that in a recent Sixth Circuit opinion, the court reiterates the petitioner's listing of Prosecutor Marino's "shameful track record of breaking rules to win convictions." *In re Lott,* 366 F.3d 431, 433 n.1 (6th Cir. 2004) (reciting the following, "*State v. Liberatore,* 69 Ohio St.2d 583, 589-90 (1982) ("the prosecutorial blunders in this case are too extensive to be excused."); *State v. Owensby,* 1985 Ohio App. LEXIS 7351, *3 (1985) ("prosecutor's comments clearly outside the bounds of mere 'earnestness and vigor[.]'"); *State v. Heinish,* 1988 Ohio App. LEXIS 3644, *20 (1988) ("Clearly the prosecutor improperly commented on excluded evidence.") *State v. Harris,* 1990 Ohio App. LEXIS 5451 (1990) (prosecutorial misconduct found, but harmless); *State v. Hedrick,* 1990 Ohio App. LEXIS 5647 (1990) (prosecutorial misconduct by making improper comments on matters outside of record and on defendant's failure to testify.); *State v. Durr,* 58 Ohio St.3d 86 (1991) (improper comments on the appellant's unsworn statement, the appellant's prior convictions, and mitigating factors held harmless.); *State v. Keenan,* 66 Ohio St.3d 402 (1993) (presenting an "aggravated example" of prosecutorial misconduct); *State v. D'Ambrosio,* 67 Ohio St.3d 185 (1993) (prosecutorial misconduct found, but either waived or harmless); *State v. Johnson,* 1992 Ohio App. LEXIS 4256, *17 (1993) (prosecutorial misconduct "[rose] to the level of being constitutional errors."); *State v. Matthews,* 1999 Ohio App. LEXIS 896, *5 (1999) (prosecutor denied making a deal with witnesses, however, "[t]here is ample evidence to suggest that [the witness] at least did in fact receive just what the assistant county prosecutor said he would not give him."); *State v. Larkins,* (Nov. 6, 2003), Cuyahoga App. No. 82325, unreported (affirming grant of new trial upon finding that Marino withheld eyewitness descriptions not matching Larkin; hid a deal he struck to obtain the testimony of the only claimed eyewitness; then stood silent as she lied about the deal and her criminal record during trial).").

The Supreme Court's comments in *Berger v. United States,* 295 U.S. 78 (1935),

appear to be particularly apropos,

> [The prosecution's interest] in a criminal prosecution is not that it shall win a case, but that justice shall be done.  As such, [the prosecuting attorney] is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer.  He may prosecute with earnestness and vigor – indeed, he should do so.  But, while he may strike hard blows, he is not at liberty to strike foul ones.  It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Id.* at 88.

## CONCLUSION

Having considered Matthews's claims *de novo*, the Court finds no factual disputes

exist which would warrant a hearing.  It is furthermore determined that based on the facts

that occurred prior to and after Matthews's trial, both key witnesses, Roulette and Paxton,

received deals from the prosecution in exchange for their testimony.  The existence of

this information was not made available to Matthews even though a written request for all

favorable evidence was made prior to trial.  Because there was no other evidence linking

Matthews to the murder, the cumulative effect of being unable to present this

impeachment evidence to the jury deprived Matthews of his constitutional right to a fair

trial.  As such, it is hereby determined that Matthews's Petition for Writ of Habeas

Corpus is CONDITIONALLY GRANTED.  The State of Ohio has 120 days from the

date of this order to retry Matthews for Price's murder.

The Court certifies, pursuant to 28 U.S.C. §1915(a)(3), that an appeal from this

decision would not be frivolous and could be taken in good faith.  The Court therefore

issues a certificate of appealability.  28 U.S.C. §2253(c); Fed. R. App. P. 22(b).


So ordered.

    _s/  John R. Adams__2/1/2006_____
    JUDGE JOHN R. ADAMS
    UNITED STATES DISTRICT JUDGE